Good morning. My name is Nicholas Reyes. I represent Mr. Omar Arreguin, who is the appellant in this matter, a case brought through the Central District out of the Riverside Court after a plea with a preserved appellate issue on the motion to suppress. The issues arise on this case on whether or not this court should affirm or reverse that decision on the motion to suppress or that. It is our position that the, what's at issue in this case, the injustices of the court is the question of whether we truly have a consensual motion to suppress. I refer to it as a consensual encounter of the third kind, or in this case, at the choice of the government. And that is, the facts of this case include that the third party, Mr. Elias Valencia, was at the kitchen window, sees between six to ten officers arrive in DEA jackets, entering through not the front iron, front iron gate, but through the front door. Not through the front door gate, but through the side of the driveway gate, which is at best partially open, not sufficient for a vehicle to come in. We're faced with the decision of the district court judge, which says it found the government's position more persuasive. Well, now, just a minute, Counselor. Let's think about that. When I look at these facts, upon which I have to apply the law, the district court finds some facts. What standard of review do I give to the district court finding of facts? Well, it's our position that it's obviously a de novo review. It's not de novo review on the facts, is it? On the facts, we have to defer, absent clear error. Yeah, it's got to be clear error for the factual determinations. And so the court said that they believed the officers more than they believed the other witnesses, and then determined what the facts were, correct? Exactly, Your Honor. And at that point, we're suggesting then that unless we can find the court clearly erred with determining what the facts are, we kind of have to take their facts, right? Unless the court finds they're unsubstantiated by the record. Well, clear error is the view, not just unsubstantiated. Clear error. Isn't that what it is? Yes, Your Honor. Okay, so if we go to clear error, then when you give us these facts, I hope you're giving us the facts the officers gave. There was one officer, Your Honor. Three witnesses for the defense, one officer for the people. Well, I understand that. But nonetheless, the officer gave it, and the judge accepted his facts, not the other witnesses' facts. The findings... And in fact, since he was down there hearing the evidence, we give him pretty much discretion at review of who tells the truth and who doesn't. This case is not necessarily couched in that the witnesses are not truthful. He says he finds one more credible. So I'm not saying that the three witnesses were not truthful. In fact, if one looks at the version of events and the circumstances of events, whether in fact it's consensual or not in the facts, I think that your independent review of the facts would indicate that there is clear error as to why a district judge can necessarily insulate itself from any review by maybe couching it in credibility. They don't technically say credibility, and they don't have to go there. I have another question. The district court judge found the police officer, Mr. Rubio, credible, and you don't appear to have challenged this finding. So aren't we bound to examine the question taking Agent Rubio's testimony as true? I believe I indirectly addressed that issue by saying that the credible witnesses are our witnesses on the facts, because there is no real factual finding which is supported by the record or clear error as to why and what. She gives us no analysis as to why they're not credible or why she doesn't believe them or why she believes the officer. Well, I don't know any good case law that suggests she has to explain. She just has to say why I believe one set of facts above another, and she says credibility. So my worry is this. If I give her the benefit of the doubt on the facts, because it's a clear error review, and I have police came to the door. Valencia was at the door. He was preparing breakfast. He came to the door. He and his wife were right behind him. From his appearance, he slept there. The officers identified themselves. They explained they'd been there before, asked permission to come in and search for more drugs. He opened the door and let them in, telling them they could search, and neither your client nor his wife said, no, wait a minute, we're in charge, don't do it. They backed up and let him in. Now tell me why that is not enough, because that's the facts she laid out. Well, those are not the facts totally in the record. Well, where are the facts, where are they not in the record? Are there any of those facts not in the record? Yes, there's facts in reference to the fact that the mother of the infant child was in her bedroom with her breast exposed. That's her testimony. Accurate, and that was confirmed and corroborated by A.G. Rubio, the only witness who was not the initial entry officer. He says he was there with the Spanish-speaking officer that came after the fact, and he did not make the initial entry. That somebody else did, but they never brought the somebody else. In addition, what you have is Aradine, who is the husband, found at a different location. They had to cross three thresholds to make that entry in contact with the female wife breastfeeding the child. The third-party guest, Elias Valencia, was at the front door, and he testified that in a more credible version than Rubio, because he says, and I'll give you the reasons why, he says quite candidly, he opened the door based on being told to open the door. And he saw six officers with guns, never told he could not consent or didn't allow him entry. And what you have here is a real situation. Do you really have a consensual encounter when six or ten officers, actually the record is, ten officers come to the door and come on in? At your time, on your time, when they've already had a briefing before, that they were going to affect entry. And that was their purpose. Is it a consensual encounter? They're nowhere to retreat. So your argument is really on, you have a different version of the facts than did the district judge? Is that your argument? I think the facts were on, testified in the record, and that's the record before this court. And those facts, I think this court can make a finding that if you read Rubio's testimony, he says, I don't remember, I don't recall. I can't say that with any reasonable certainty under cross-examination quite candidly. And when he says that, there is no basis to say, I don't believe one, not one witness, two witnesses or three witnesses, which corroborate the version of events which says, you know, the presumption is there's no warrant and there's presumption there should be a warrant. Why did they circumvent judicial review? Let me ask you this. Do you agree that in a cursory safety sweep, one could go to the garage? None of these facts. And the reason is because these facts, there was no entry of the garage by the big garage door, which you would assume is a fact. They entered through the house, through the gate, the front gate, through the two doors, and then through the bedroom, another door, and then had to go through another door to get to the garage through the indoor garage. So to your view, because they had to go through the bedroom to get to the garage, there's a problem because that doesn't jump right out from the evidence. And from the evidence, it kind of looks like they went to a garage and they also went to a bedroom. And I can understand where you might get pretty hyper, even given the government's best evidence, that they couldn't get to a bedroom simply because the guy says come in, because he certainly wouldn't have had a chance to get in the bedroom. But I'm just trying to figure out what's your best evidence or what's your best case. The best evidence is Valencia, the third-party guest, says, I do not reside here. I live in Atlanta. He shows him an ID from Atlanta. I do not reside here. That's after everything's done, right? Rubio takes two views on that, if one reads the record correctly. Rubio says, I didn't make the initial entry. I just talked to Valencia and then I talked to him outside. But then he says he sees the female, the wife of Aragine, in the kitchen area. I mean, I'm sorry, in the living room area. But that living room area is only after other officers made the entry and went through the house. Now, can they make a cursory sweep? I read cursory sweep to mean they have a legitimate right to be there first, to go in there and look. And you can't create your own plain view. You can't create your own situations where, in a home, there's nowhere to retreat. We're supposed to be in the luxury and privacy of one's home. So the issue of and, in fact, is I think the record's quite replete. All right. Thank you, Counselor. I think your time has expired. Good morning, Your Honors. Mark Yohalam on behalf of the United States. I do think that, with respect to my opponent, this is a clear error review of factual findings. It's a standard review that's especially deferential to credibility determinations and consent determinations. And here, again, he just attempts to re-argue the case that was argued below without really explaining why the findings of the district court are clearly erroneous. That's a very high standard to meet. One of the more flavorful descriptions of clear error this court has had is that the error has to strike the court with the stench of a week-old dead fish. And here, that's just not the case. I mean, at best, the defendant would be able to argue that there are two competing accounts, but there's nothing in the record that would show that his account is more accurate. What's in the record shows that Valencia had authority to give anybody consent to ransack the house. Do you mean actual authority, Your Honor, or apparent authority? Well, take your choice. Either one. On apparent authority, what the district court found happened is the officers came to the door, they knocked. Nine officers. Well, I hear ten and I hear eight, but one place in the record it says nine. Now, that type of a DEA convention on your front porch is a little bit coercive. I don't think it's coercive. And usually, when they're going to go to a dwelling house, they get a warrant because they're going to be searching a house. My understanding, Your Honor, is that consent searches like this are not uncommon. Consent, that's the consent here, given the facts, the best facts for the government, still looks like a lot of coercive consent going on here. I don't think so, Your Honor. I think that you have agents who do not have their weapons drawn. They don't speak in a threatening manner. Why nine? I know that we know from other cases that the DEA does this. They swarm a place with no warrant, and then they get consent from somebody, and then we have a big appeal argument over whether the consent was apparent or apparent authority or actual authority and so forth. I think likely the reason they didn't obtain a warrant is that they may have felt that at this stage there wasn't probable cause to obtain a warrant, Your Honor. Now, I don't want to go beyond the record. Looking simply at what's in the record, however, what they knew is that this house had been a stash house before, a drug house for methamphetamine. But that had been some time before. They had a suspicion, it seems, that this house was again being used as a stash house. It's unlikely that they could have gotten a warrant for that. Now, Your Honor suggests that maybe they should have gone up with fewer DEA agents, perhaps without body armor. I submit to the court that that would be extremely dangerous to do. This is a stash house with a substantial quantity, it turns out, of methamphetamine in it. It is not uncommon for, in situations like that, if the law enforcement doesn't have sufficient manpower, doesn't have body armor, that they would be endangering themselves. So they came there. They did what is fairly standard, which is they approached the house. They didn't demand entry. They requested entry. They were met at the door after they knocked by a 20-year-old man. They could see two other adults further inside. They asked the man if they could enter, and he said they could. There was no objection from the two other adults. Under those circumstances, I think the lack of an objection by the two other adults reasonably could have been viewed as the officers and was viewed as the officers that Mr. Valencia was in control of the situation. Go ahead. Even they, I think, were a little uncertain as to whether they had consent. And my question is, how can his written consent form for a search that has already taken place, how can that be valid? I think that that – well, let me answer that in two ways. First, I think the district court did state something that was a little bit mistaken, in its order, which is that it said that even if Valencia's consent was not valid, the written consent from defendant would have saved the search. I'm not sure the government is not taking that position here because I agree with you that if the initial entry were illegal and they had searched the house illegally, then obtaining the consent is probably inadequate. There's probably a taint that flows from the original illegal entry. Obviously, the government's view is that the entry was consensual and constitutional. Once you're at that stage where there's been a consensual constitutional search, I don't see why they can't then get additional consent to continue the search. Well, let's talk a little bit more. It's my understanding, based on the evidence, that they went in and then they did some kind of a safety sweep, whereupon they went to the garage and to the bedroom. I'm having a tough time seeing how they got to the garage and the bedroom on a safety sweep. Well, to begin with – In what case do I have that would say that a person who isn't the owner of the house, not the one that's in charge, can consent to take in a cursory safety sweep of a bedroom? Well, to begin with, Your Honor, I think the important thing is that when Mr. – Answer my question, will you? Is there a case that says that one can do a cursory safety sweep of a bedroom that is not his house? Do you find a case? You don't, do you? I think you could find a case where the officers believed that the person who had consented had authority to consent to a search of the house. Well, there was nothing that suggested that, that they could search the bedroom. Well, I'm not – I'm not understanding your question, Your Honor. Well, frankly, you can have me and another person who are in the same house and I can let them in and they can search all those things to which I would normally be able to go, but it isn't normal for me to be able to give a search to the bedroom in those cases at all. If it's not your bedroom. But there's nothing in this record that indicates that the officers knew or believed that the bedroom wasn't Valencia's bedroom. There's nothing to suggest they knew it was Valencia's bedroom. They believed reasonably that Valencia had authority over the home. If you look at – Your Honor asked for a case, I would say the Insulin case. This isn't in our brief, but that's because this issue wasn't raised by defendant. The Insulin case at 326 – This issue wasn't raised? No, I don't think it was, Your Honor. I think defendant's argument is that Valencia simply didn't consent at all to the search. Defendant does not make the argument that Valencia had authority to consent to a search of some of the house but not all of the house. That's a very different argument from the argument that he raises. But regardless, there's the Insulin case. In the Insulin case, a woman comes to the door and gives the officers consent to search the house. There's a bedroom. That bedroom belongs to someone else in the house, and the officers go into it. It turns out that the woman didn't have authority over that bedroom, but the court held that there she had apparent authority. What's the cite for that case? It's 327 F. 3rd, 788. But by citing that case to the court, I don't want to concede the ground that – I think there are two points. One is that I think Valencia had apparent authority over the entire dwelling, and I think particularly where two other people are standing there and don't object. And here I think the Randolph case is very instructive, the Supreme Court's decision. Well, I guess my worry about this is this. If I were to affirm only to the extent of what one could give apparent authority to search, I would be suggesting that one could give apparent authority to search only what one could give that authority to search. And therefore, to the extent the search was beyond that authority, the search is unconstitutional and sent it back to the district court to decide what to do. I think I agree with Your Honor that one can only have apparent authority over what one has apparent. That is, if one appears to be the owner of the house, one has authority, or the primary resident of the house, one has authority to consent to a search of the house. If one appears to be a renter of one room in the house, one has apparent authority to consent to the search of that one room. Here the evidence is that Valencia had apparent authority over the entire home, and I think that is strongly supported by the failure of defendant and Ledesma to object. I think that fact is so critical here because... Do you have any cases about a duty to speak up when the officers come in like this in a large force? I think the Randolph case is instructive, Your Honor. That doesn't create a duty to speak up, but it does say if two people, each of whom have authority over a space, meet the officers at the door and one of them consents, the officers can search unless the other one objects. If the other one objects, the officers can't search. Now here I think it is perfectly reasonable when officers come to a door and there are three people there. One of them speaks to them and says, come in, and the other ones say nothing. For the officers to assume reasonably that all three have consented to their entry into the home and their search of the home. As for the protective sweep, once you say the officers are allowed to be in the home, my understanding, and I can't say the specific case to you, Your Honor, but my understanding is that a protective sweep is anywhere where a person could be hiding in the home. A person certainly could be hiding in a bedroom and certainly could be hiding in a garage. What a protective sweep doesn't let you do is search through nooks and crannies. For example, they couldn't search through a filing cabinet under a protective sweep, but here there's no indication that that's what they did. They went to the garage and there in plain view was an open bag full of money. Let me just ask about that. Based on Agent Rubio's declarations, it's unclear whether just the Gucci bag in the car was in plain sight or whether the bundled $100 bills inside the bag were in plain sight. And this is, to me, a very significant difference because Agent Rubio's testimony was ambiguous about this and the government has the burden of proving the reasonableness of the search. Aren't we bound to conclude that the search of the bag cannot be justified on the plain view exception? No, Your Honor, I don't think so at all for several reasons. One is that defendant didn't raise that argument below that it would be reviewed for plain error and under plain error review it's he who has the burden of showing prejudice. He can't do that. What happened here is defendant failed to raise this argument. The government failed to have an opportunity to develop facts that would have carried our argument for plain view. He can't then sandbag the government. He doesn't even try to, but he shouldn't if he had tried to try to sandbag the government. But we can't either. I would certainly ask the court not to. I'm never going to tell the court what it can and can't do. The second reason, though, is that the officers had consent to search. I think this would be pushing it a little bit, actually, to say that that consent extended to opening a Gucci bag because probably they should have assumed that belonged to a woman, not to Valencia. But we don't know if the bag was open or not. I think viewing the record in the light most favorable to the government due to defendant's failure to raise that argument below, I think you would have to conclude that the money was in plain view as well. Likewise with the shoebox, not clear from the record whether the shoebox was open or closed. Or where it was. I think it's clear that it was... It's in the bedroom, but that's all we know. Yeah. Okay, thank you very much for your argument. I'll give you a minute for Buttle. He took longer over a minute than you. I wasn't expecting to get an additional minute, but if I could focus this court on why I believe that the Constitution mandates reversal is that there's no findings of fact which would undermine the testimony of three independent separate witnesses and the entry officer never testified. It was Rubio who says he was about the third guy that came in and only for his Spanish speaking abilities. Now, and I don't believe the district court judge can insulate itself from review by just saying one's more persuasive than the other, I find one more credible than the other, without making specific determinations of why you can't believe. And when it takes Rubio's testimony, he confirms that the female, the mother of the infant child, was not in the living room. In fact, Aragon and the wife were not in the living room or anywhere near the front door upon entry. In fact, Rubio was not the initial entrant. They swept in, they came in, and I think the record evidence will show that in fact she was in the bedroom. That's uncontroverted. No one said otherwise. They didn't bring the officer who allegedly went in there into the bedroom. In fact, they didn't bring the officer who did the entry into the garage either. It's Rubio who says he made contact with Valencia at the front door, and then he talks to him outside about Atlanta and ID and living elsewhere and being a mere guest. Thank you for your rebuttal. You had one more point? Just one last item. Okay. I'll let you just one sentence or two. About three hours, and I've got to give him more time. Okay. Then that last item is why, under these circumstances, would these trained DEA agents choose to create consent, alleged consensual encounters where they have nowhere to retreat but their own castle in their own bedroom with breasts exposed when they choose not to go before a magistrate with independent review on the issue of entry? Thank you. Appreciate your arguments, counsel. This case 09-50552 is hereby submitted. We're now at case 10-50137, United States of America v. Malkovich, which is submitted on the briefs. Then we have case 06-75313, Wu v. Holder, which, again, has been submitted on the briefs. And, therefore, we turn to case 09-5501, Jaime Alvarez v. City of San Bernardino. Thank you.
judges: Goodwin, Nelson D. W., Smith N. R.